IN THE SUPREME COURT OF NORTH CAROLINA

No. 369A19

Filed 20 November 2020

IN THE MATTER OF: A.H.F.S., R.S.F.S., and C.F.S.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) and on writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an order entered on 28 May 2019 by Judge Mack Brittain in District Court, Henderson County. This matter was calendared for argument in the Supreme Court on 7 October 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Susan F. Davis for petitioner-appellee Henderson County Department of Social Services.*
>
> *Katelyn Bailey Heath and Heather Williams Forshey for appellee Guardian ad Litem.*
>
> *Anné C. Wright for respondent-appellant father.*
>
> *Mercedes O. Chut for respondent-appellant mother.*

BEASLEY, Chief Justice.

Respondent-parents appeal from the trial court's order terminating their parental rights to A.H.F.S., R.S.F.S., and C.F.S.[1] After careful review, we affirm.

---

[1] The minor children A.H.F.S., R.S.F.S., and C.F.S. will be referred to throughout this opinion as "Amy," "Riley," and "Charley," which are pseudonyms used to protect the identity of the juveniles and for ease of reading.

On 5 May 2016, the Henderson County Department of Social Services (DSS) filed petitions alleging that Riley, a newborn, was a neglected and dependent juvenile, and Charley, a one-year-old, was a neglected juvenile. DSS stated that Riley and respondent-mother had tested positive for amphetamines at Riley's birth, and respondent-mother had admitted to using an unknown substance twice in the days leading up to Riley's birth. DSS further claimed that Charley, along with respondent-mother, had also tested positive for drugs when he was born in 2014. DSS alleged that respondent-mother had untreated bipolar and anxiety disorders and claimed that, while respondent-mother was still at the hospital, a social worker observed her "acting erratically, acting anxious, speaking very fast and repeating herself." Because of respondent-mother's behavior, the hospital would not allow respondent-mother to be with Riley unsupervised.

Respondent-mother left the hospital on 2 May 2016 against the advice of doctors because she stated she wanted a cigarette. Riley remained at the hospital, and respondent-mother visited only once after leaving. Respondent-father also visited Riley only once while she was at the hospital. Both respondents refused to take a drug screen offered by the social worker. DSS asserted that because of respondent-mother's history and current substance abuse and due to respondent-father's long work hours neither parent could properly supervise or care for Riley or Charley. DSS stated that a babysitter was watching Charley while respondent-father worked, but the babysitter could not also watch Riley. DSS further claimed that neither of the

respondents could identify an appropriate family member or friend who could care for the two juveniles. Accordingly, DSS obtained nonsecure custody of Riley.

A nonsecure custody hearing was held on 12 May 2016. DSS filed a supplemental petition claiming that Charley was at risk because respondent-father was allowing respondent-mother to care for Charley without supervision. DSS asserted that respondent-mother had unaddressed substance abuse and mental health issues and had refused to demonstrate sobriety by complying with drug screens. DSS obtained nonsecure custody of Charley.

On 2 August 2016, the trial court adjudicated Riley a neglected and dependent juvenile and Charley a neglected juvenile. On the same date, the trial court entered a separate dispositional order granting legal custody of the juveniles to respondents subject to "strict and complete compliance" with requirements set forth in the order.

On 21 February 2017, DSS filed new petitions alleging that Riley was a neglected and dependent juvenile and that Charley and newborn Amy were neglected juveniles. DSS alleged that Amy had been born approximately ten to twelve weeks premature but that it was difficult to determine her exact gestational age at birth because respondent-mother did not receive any prenatal care. At her birth, both Amy and respondent-mother tested positive for amphetamines and methamphetamines.

On 17 March 2017, DSS filed a supplement to Amy's juvenile petition. DSS stated that Amy was still in the Neonatal Intensive Care Unit, was being fed through a feeding tube, and had problems with her heart rate dropping. DSS further stated

that respondents, or any potential caregivers for Amy, would need to receive special training in order to understand and identify the special needs of a premature baby. DSS claimed, however, that respondents had not received this training because respondent-mother had visited with Amy only twice since her birth, and respondent-father had not visited Amy since 25 February 2017. DSS additionally alleged that respondent-mother would not allow the social worker into the residence to observe its condition, and respondent-mother had refused drug screens requested by DSS on 9 February 2017 and 10 March 2017. Accordingly, DSS obtained nonsecure custody of Amy. Riley and Charley remained in respondents' home.

An adjudicatory hearing was held on 6 July 2017. On 3 August 2017, the trial court entered an order adjudicating Riley, Charley, and Amy neglected juveniles. On the same date, the trial court entered a separate dispositional order in which it granted legal custody of all three juveniles to DSS and authorized DSS to place the children in foster care. The trial court granted respondents supervised visitation. To achieve reunification, both parents were ordered to, *inter alia*, obtain mental health and substance abuse services, maintain appropriate housing, ensure that the children received appropriate evaluations, and comply with recommendations from those evaluations.

On 15 November 2017, the trial court set the primary permanent plan for the juveniles as reunification and the secondary plan as termination of parental rights and adoption. On 23 August 2018, the trial court held a permanency planning review

hearing. In an order entered 8 October 2018, the trial court found that respondents had failed to complete the requirements for reunification. The court determined that the juveniles' return home within six months was unlikely, reunification efforts would be unsuccessful or inconsistent with the health or safety of the juveniles, and adoption should be pursued. Accordingly, the trial court changed the primary permanent plan for the juveniles to termination of parental rights and subsequent adoption with a secondary permanent plan of reunification or custody/guardianship with a third party. The trial court further ordered that DSS should not file a petition or motion to terminate parental rights until the results of an Interstate Compact on the Placement of Children (ICPC) home study on a relative were known.

On 19 December 2018, DSS filed a motion to terminate respondents' parental rights pursuant to neglect and willful failure to make reasonable progress. *See* N.C.G.S. § 7B-1111(a)(1) and (2) (2019). On 28 May 2019, the trial court entered an order terminating respondents' parental rights based on the grounds alleged in the petition.

On 27 June 2019, respondents gave timely notice of appeal pursuant to N.C.G.S. §§ 7A-27(a)(5) and 7B-1001(a1)(1).

Respondents first argue that the trial court erred by concluding that grounds existed to terminate their parental rights. A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). At the adjudicatory stage, the petitioner bears the burden of

proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under section 7B-1111(a) of our General Statutes. N.C.G.S. § 7B-1109(f) (2019). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111 (1984) (citing *In re Moore*, 306 N.C. 394, 404, (1982)). If the petitioner meets its burden during the adjudicatory stage, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842 (2016) (citing *In re Young*, 346 N.C. 244, 247 (1997); N.C.G.S. § 7B-1110).

"[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395 (2019). We begin our analysis with consideration of whether grounds existed pursuant to N.C.G.S. § 7B-1111(a)(2) to terminate respondents' parental rights. This section provides that the court may terminate parental rights if "[t]he parent has willfully left the juvenile in foster care . . . for more than [twelve] months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C.G.S. § 7B-1111(a)(2).

> Termination under this ground requires the trial court to perform a two-step analysis where it must determine by clear, cogent, and convincing evidence whether (1) a child

has been willfully left by the parent in foster care or placement outside the home for over twelve months, and (2) the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.

*In re Z.A.M.*, 374 N.C. 88, 95 (2020).

Respondents do not contest that the juveniles have been in placement outside of their home for more than twelve months. Instead, respondents contend they made reasonable progress towards correcting the conditions which led to their removal. We disagree.

We first address the conditions that led to the removal of the juveniles. The trial court's finding of fact 21 states that the juveniles were adjudicated neglected and removed from respondents' care in 2017 "due to domestic violence between the parents, the mother's substance abuse, the conditions and safety of the home, the mother's mental health and the juvenile's medical needs which need to be addressed." Respondent-mother contends that this finding is inaccurate because the 2017 adjudicatory order contains no findings regarding domestic violence. We agree. The adjudicatory order entered on 3 August 2017 does not mention domestic violence as an issue necessitating the filing of the juvenile petition and removal of the juveniles from respondents' home. Thus, we will not consider that portion of finding of fact 21 that states the juveniles were removed from respondents' care due to domestic violence.

Respondent-mother also contends that the only conditions which led to the juveniles' removal were: (1) her positive drug test at Amy's birth; and (2) the unsafe and cluttered condition of her home shortly before Amy's birth. She claims the remaining conditions cited in finding of fact 21 and described in the adjudicatory order existed throughout the 2016 case in which the juveniles were not removed from her home, and thus these conditions were not a proximate cause of their removal in 2017. We are not persuaded.

In the 2017 adjudicatory order, the trial court cited respondent-mother's substance abuse and untreated mental health issues, the unsafe condition of respondents' home, and Riley's and Charley's physical, emotional and developmental issues that were not being addressed by respondents as grounds for removal. The trial court also noted that respondent-mother was the primary caregiver for the juveniles, and respondent-father's long work hours prevented him from contributing to childcare or the upkeep of the home. Respondent-mother did not appeal from the trial court's adjudicatory order and is bound by the doctrine of collateral estoppel from relitigating this issue. *See In re T.N.H.*, 372 N.C. 403, 409 (2019) (stating that because the challenged facts were necessary to the determination in a prior adjudicatory order and the mother did not appeal from that adjudicatory order, she was bound by the doctrine of collateral estoppel from relitigating the findings of fact) (citing *King v. Grindstaff*, 284 N.C. 348, 356 (1973)). Respondent-mother cannot now contend that these issues did not lead to the juveniles' removal.

We next address respondent-mother's failure to correct the conditions which led to the juveniles' removal. The trial court found that respondent-mother: (1) failed to complete individual substance abuse therapy as recommended by her Comprehensive Clinical Assessment; (2) failed to submit to forty-three of fifty-six requested drug screens and tested positive for methamphetamines on 1 April 2019 and 15 April 2019; (3) was convicted of two counts of Felony Possession of a Schedule II controlled substance in March 2019 with the dates of the offenses being 20 November 2018 and 28 February 2019; (4) was diagnosed with severe bipolar disorder and failed to address these issues in therapy as recommended by her Comprehensive Clinical Assessment; (5) failed to demonstrate skills learned in parenting classes; (6) failed to attend seventeen of twenty-eight medical/dental appointments for the juveniles and failed to ensure that the medical, dental, and developmental need of the juveniles are being met; and (7) failed to provide a safe and appropriate home for the juveniles.

Respondent-mother contends that there was insufficient evidence to support the trial court's finding that her home was unsafe. She further argues that her admission that the home was unsafe, cited by the trial court in finding of fact 35, occurred over a year before the termination hearing and was both stale and an improper recitation of testimony. We disagree. Respondent-mother refused to let social workers into the home on numerous occasions, thus preventing social workers from determining whether the conditions of the home had improved. When

respondent-mother did allow social workers inside the home, they reported little improvement. On 7 July 2018, the guardian ad litem reported to the trial court that "[t]here has been marginal improvement in the cleanliness and safety of the house." On 23 August 2018, a social worker reported to the court that while she had observed some progress during recent visits, "the home consistently has extreme clutter, safety hazards throughout the home such as cleaning chemicals, motor oil bottles on the ground, choking hazards as well as trash throughout the home." Thus, the trial court could reasonably infer from these continuing conditions that the home was still unsafe.

Respondent-mother additionally challenges as not being supported by the evidence the portion of finding of fact 36 which states that while she completed parenting class, she failed to demonstrate the ability to provide proper care for the juveniles. We are not persuaded. The social worker testified at the termination hearing concerning respondent-mother's inability to meet the juveniles' needs. The social worker noted that immediately following a conversation with the pediatrician that Amy was lactose intolerant, respondent-mother offered the children regular milk, and social workers were forced to intervene. Moreover, respondent-mother was invited to attend the juveniles' medical and dental appointments. Of the twenty-eight appointments to which she was invited, she did not attend seventeen of those appointments. Considering the fact that each of the juveniles has special needs, the trial court could reasonably infer that respondent-mother has not demonstrated the

ability to provide proper care for the juveniles when she missed over half of the juveniles' medical appointments.

Respondent-mother argues that finding of fact 39, that she failed to ensure the medical, dental, and developmental needs of the juveniles were being met, is erroneous. Respondent-mother asserts that she did not have legal custody of the juveniles and thus had no ability to ensure these needs were being met. e disagree. All three juveniles have special needs. To address the juveniles' special needs, the trial court ordered respondent-mother to attend medical, dental, and developmental appointments. Respondent-mother does not challenge the trial court's findings that she failed to attend numerous appointments. Thus, again, we conclude the trial court could properly infer that respondent-mother failed to ensure the juveniles' medical, dental, and developmental needs were being met.

The trial court could reasonably conclude that respondent-mother's continuing unaddressed substance abuse issues, the unsafe condition of the home, and respondent-mother's failure to attend medical and developmental appointments for the juveniles, evidenced a failure to correct the conditions that led to the removal of the juveniles.

Respondent-mother contends that the trial court failed to find that she had the ability to make progress regarding the conditions of removal by making a finding of willfulness. However, the trial court made this required finding in its conclusions of law when it determined that respondent-mother had "willfully" failed to make

reasonable progress. Although set forth in the conclusions of law, the trial court's determination of willfulness was an ultimate finding of fact. Regardless of whether this finding is classified as an ultimate finding of fact or a conclusion of law, it still must be sufficiently supported by the evidentiary findings of fact. *See In re Z.A.M.*, 374 N.C. at 97 (stating that this Court reviews termination orders "to determine whether the trial court made sufficient factual findings to support its ultimate findings of fact and conclusions of law, regardless of how they are classified in the order"). Here, we conclude that the trial court's conclusion that respondent-mother willfully failed to make reasonable progress is supported by clear, cogent, and convincing evidence and sufficient evidentiary findings of fact. Accordingly, we hold that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(2) to terminate respondent-mother's parental rights.

We next address respondent-father's willful failure to correct the conditions which led to the juveniles' removal. Respondent-father contends that he completed a majority of the requirements of his case plan and thus made reasonable progress. While respondent-father did make progress on several requirements of his case plan, we conclude that the trial court did not err in finding that his progress did not constitute reasonable progress under the circumstances of this case.

Regarding respondent-father, the trial court made the following pertinent findings of fact:

34. The conditions of the home led to the removal of the juveniles. The Social Worker has been to the home 21 times and has been denied access to the home 9 times. The Social Worker has observed the home and yard to be extremely cluttered with safety hazards and trash in the home and yard. On April 17, 2019 the Social Worker went to the home and was denied access to the inside of the home by the mother who said the house was trashed.

35. Both the mother and father have discussed numerous times that items and money have been stolen from the home. The mother has acknowledged to the Social Worker that the home is not safe for the juveniles.

. . . .

47. The father continues to reside with the mother. The condition of the home is not appropriate for the juveniles.

48. The father completed parenting classes but has failed to demonstrate benefit from those classes.

49. The father has failed to ensure that the juveniles' medical, dental and developmental needs are being met. Of the 28 times the father was invited to the juveniles' appointment, he was a no show 18 times, even though [DSS] would notify the father months in advance to the date and time of the appointments.

Respondent-father contends that finding of fact 34 is not specific enough regarding when the clutter and safety hazards were observed. However, as noted previously herein, a social worker and the guardian ad litem raised concerns about the state of the home. Accordingly, we conclude this finding of fact was supported by clear, cogent, and convincing evidence.

Respondent-father challenges finding of fact 48, claiming that the trial court's determination that he "failed to demonstrate benefit" from parenting classes was not supported by clear, cogent, and convincing evidence. Respondent-father cites reports from DSS and the guardian ad litem which he claims demonstrated his progress. However, a social worker testified the respondents have had multiple meetings with the children's therapists, during which the therapists discussed recommendations for respondents to follow during visits to address each child's needs. Neither respondent has followed through with those recommendations. Additionally, respondent-father would engage in arguments with respondent-mother and would repeatedly tell her to "shut up" in the presence of the juveniles. Accordingly, we conclude there was clear, cogent, and convincing evidence to support this finding of fact.

Respondent-father also challenges finding of fact 49 and argues that he attended over a third of the juveniles' appointments and "took no actions to impede [DSS] in getting the children's needs met." Respondent-father claims that this constitutes reasonable progress. We disagree. Respondent-father, along with respondent-mother, were ordered to attend the juveniles' medical, dental, and developmental appointments. As discussed previously, the juveniles all have special needs, and it was important that respondents attend these appointments to be educated regarding these special needs and to comply with treatment recommendations for the juveniles. As found by the trial court, respondent-father failed to attend a majority of the appointments even though he was given notification

months in advance of the date and time of the appointments. Even when respondent-father attended appointments, a social worker testified that he was unable to follow through with treatment recommendations. Thus, we conclude that clear, cogent, and convincing evidence supports the trial court's finding that respondent-father missed numerous appointments, and the trial court could reasonably infer that respondent-father failed to ensure that the juveniles' medical, dental, and developmental needs were being met.

The trial court also made several findings demonstrating respondent-father's compliance with his case plan and efforts to correct the conditions that led to the juveniles' removal. The trial court found as fact that respondent-father completed individual therapy, "did what he could to complete couple's therapy," and had attended scheduled visitation with the juveniles. Despite these findings demonstrating that respondent-father made some progress, we conclude that respondent-father had not remedied the primary conditions which led to the removal of the juveniles. As noted by the trial court, respondents continue to reside together, and their primary residence is still unsafe.

Respondent-father argues that the trial court erroneously based its determination that grounds existed to terminate his parental rights largely based on his continuing relationship with respondent-mother. As discussed above, it is apparent that the trial court considered ample evidence independent of his relationship with respondent-mother.

Because the trial court's conclusion that a ground for termination existed pursuant to N.C.G.S. § 7B-1111(a)(2) is sufficient in and of itself to support termination of respondents' parental rights, we need not address respondents' arguments regarding N.C.G.S. § 7B-1111(a)(1). *In re T.N.H.*, 372 N.C. at 413.

We next consider respondents' arguments concerning disposition. If the trial court finds grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it proceeds to the dispositional stage where it must "determine whether terminating the parent's rights is in the juvenile's best interest" based on the following factors:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019). The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed only for abuse of discretion. *In re D.L.W.*, 368 N.C. at 842. "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285 (1988).

We initially note that the trial court properly considered the statutory factors set forth in N.C.G.S. § 7B-1110(a) when determining the juveniles' best interests. The trial court made uncontested findings: (1) regarding the age of the juveniles; (2) that adoption of each juvenile was likely; (3) that termination of respondents' parental rights would aid in the permanent plan of adoption; (4) that Charley had a strong bond with respondents, but Riley and Amy did not; (5) that the juveniles were bonded to their prospective foster parents; (6) that the foster parents were providing for the juveniles' special needs; and (7) that the proposed adoptive parents had agreed to allow the juveniles to visit with each other on a regular basis. Because respondents do not challenge these dispositional findings, they are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437 (2019).

Respondent-father argues that it was not in Riley's and Amy's best interests that his parental rights be terminated without first considering the results of an ICPC home study previously ordered by the court at the 23 August 2018 permanency planning review hearing. Respondent-father further claims that it was not in Charley's best interests to terminate his parental rights given the strong bond between himself and Charley. Lastly, respondent-father contends that while Riley and Amy did not have a strong bond with respondents because all three juveniles were living in different prospective adoptive homes, it was not in Riley's and Amy's best interests that respondent-father's parental rights be terminated because it eliminated the potential for them to live together as a family. We are not persuaded.

First, although the trial court found that Charley was strongly bonded to respondents, this Court has recognized that "the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. at 437. Based on the trial court's consideration of the other factors and given the respondent's lack of progress in his case plan, this Court concluded in *In re Z.L.W.* that "the trial court's determination that other factors outweighed [the] respondent's strong bond with [the juveniles] was not manifestly unsupported by reason." *Id.* at 438. Similarly, here, we conclude that the trial court's determination that other factors outweighed respondents' strong bond with Charley was not an abuse of discretion.

Second, while the trial court had previously ordered that DSS wait to file a petition to terminate respondents' parental rights pending an ICPC home study in Virginia, and termination of respondents' parental rights precluded the three juveniles living together as a family unit, we have explained in *Z.L.W.*:

> [w]hile the stated policy of the Juvenile Code is to prevent "the unnecessary or inappropriate separation of juveniles from their parents," N.C.G.S. § 7B-100(4) (2017), we note that "the best interests of the juvenile are of paramount consideration by the court and . . . when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a *safe, permanent home within a reasonable amount of time*," *id.* § 7B-100(5) (2017) (emphasis added); *see also In re Montgomery*, 311 N.C. at 109, (emphasizing that "the fundamental principle underlying North Carolina's approach to controversies

> involving child neglect and custody [is] that the best interest of the child is the polar star").

*Id.* at 438. Consequently, in *In re Z.L.W.*, we held the trial court did not abuse its discretion in determining termination, rather than guardianship, was in the best interests of the juveniles. *Id.*

In the instant case, as in *In re Z.L.W.*, the trial court's findings of fact demonstrate that it considered the dispositional factors set forth in N.C.G.S. § 7B-1110(a) and "performed a reasoned analysis weighing those factors." *In re Z.A.M.*, 374 N.C. at 101. Thus, while consideration of placement alternatives and preserving family integrity is an appropriate consideration in the dispositional portion of the termination hearing, the best interests of the juveniles remain paramount. Accordingly, "[b]ecause the trial court made sufficient dispositional findings and performed the proper analysis of the dispositional factors," *id.*, we conclude the trial court did not abuse its discretion by concluding that termination of respondent-father's parental rights was in the juveniles' best interests.

Respondent-mother's argument concerning disposition is contingent on respondent-father's retention of his parental rights. Respondent-mother claims that respondent-father substantially complied with his case plan and was a fit parent, and thus the trial court abused its discretion by determining that termination of their parental rights was in the juveniles' best interests. However, because we have already determined that the trial court properly terminated respondent-father's

parental rights, these arguments are now moot. We therefore hold that the trial court's conclusion that termination of respondent-mother's parental rights was in the juveniles' best interests did not constitute an abuse of discretion.

In summary, we conclude that the trial court did not err in its determination that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(2) to terminate respondents' parental rights. We further conclude that the trial court did not abuse its discretion by determining that termination of respondents' parental rights was in the juveniles' best interests. Accordingly, we affirm the trial court's order terminating respondents' parental rights.

AFFIRMED.